### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MAINE

Civil Action No._____

**CIVIL COMPLAINT**
**INJUNCTIVE RELIEF SOUGHT**

ROBERT M. HOOPER,

*Plaintiff*,

v.

ST. ANDRE HEALTH CARE FACILITY,

*Defendant*.

Plaintiff Robert M. Hooper, by and through his attorneys, alleges the following:

### INTRODUCTION

1. Plaintiff Robert M. Hooper brings this action against Defendant St. Andre Health Care Facility to challenge Defendant's decision to disable or otherwise restrict the use of Mr. Hooper's medically necessary mobility equipment. Mr. Hooper is a resident of Defendant's long term care facility, where he has lived since 2008.

2. Mr. Hooper has suffered a series of strokes. These strokes left him unable to walk or to propel a manual wheelchair due to paraplegia of the left side of the body and weakness of the right side of the body. As a result, Mr. Hooper was prescribed and provided a motorized wheelchair after it was deemed medically necessary by MaineCare. Mr. Hooper owns this medical equipment and is dependent on it for independent mobility.

1

3.  From on or about November 1, 2012 through June 20, 2013, a period of approximately 232 days, Defendant disabled Mr. Hooper's mobility equipment.  When Defendant disabled the chair, Mr. Hooper was effectively immobilized and dependent on staff to meet all of his needs. Mr. Hooper was required to press a call button or ring a bell and wait for staff to bring him water or coffee, or to wash his hands or face, or even to turn him around to move away from the sun coming through his window – all activities he could do independently using his medically necessary mobility equipment.

4.  Since on or about June 20, 2013, Defendant has restored some functioning to Mr. Hooper's wheelchair, but continues to severely restrict the use of this medically necessary mobility equipment.

5.  But for Mr. Hooper's physical disabilities, he would be able to walk.  And on information and belief, Defendant would not have bound his legs for 232 days, or otherwise placed severe restrictions on his ability to walk.  But for Mr. Hooper's physical disabilities, he would be able to operate a manual wheelchair.  And on information and belief, Defendant would not have strapped him to a chair for 232 days, or otherwise placed severe restrictions on his ability to use his manual wheelchair.  Due to Mr. Hooper's disabilities, Defendant's decision to disable his only means of independent mobility is no different than binding his legs or strapping him to a chair.

6.  Each and every time Defendant disabled Mr. Hooper's medically necessary mobility equipment, it subjected him to discrimination on the basis of his disability and denied him the opportunity to participate fully and derive full benefit from the goods, services, and facilities provided by Defendant.  And each and every time Defendant disabled Mr. Hooper's medically necessary mobility equipment, it subjected him to an impermissible restraint under Maine law.

7.  Mr. Hooper has been harmed and continues to be harmed by these unwarranted restrictions on his independent mobility.  He has lost interest in activities he once enjoyed, engaged in self injurious behaviors, and become increasingly isolated.  He went from spending free time independently outside, to sitting alone in his room and needing assistance to turn around.

8.  Mr. Hooper brings this action pursuant to the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, as well 22 M.R.S.A. § 7948, a Maine statute which provides a right of action to nursing home residents who seek to address rights violations.  Mr. Hooper seeks injunctive relief, declaratory relief, compensatory damages, and reasonable attorneys' fees and costs.

## JURISDICTION AND VENUE

9.  This is an action for declaratory and injunctive relief brought pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et. seq.*  This is also an action for declaratory and injunctive relief and compensatory damages pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 and 794(a).  Finally, this is an action for injunctive and declaratory relief filed pursuant to 22 M.R.S.A. § 7948, which provides a right of action to residents of nursing facilities.

10. Plaintiff is a citizen of the United States and the State of Maine, and resides in the City of Biddeford, York County, Maine.

11. Defendant is a not-for-profit corporation incorporated in the State of Maine.  Defendant primarily conducts its activities and maintains its principal place of business in the City of Biddeford, York County, Maine.

3

12. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

13. This Court has supplemental subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2), as all events or omissions giving rise to these claims occurred within the District of Maine.

15. This Court has jurisdiction to issue injunctive relief and a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

16. Plaintiff Robert M. Hooper is 59 years old.  For the entire time period relevant to this Complaint, Mr. Hooper has been a resident of Defendant's long term care facility in Biddeford, County of York, State of Maine.

17. Defendant St. Andre Health Care Facility is a not-for-profit corporation incorporated in the State of Maine.  Defendant primarily conducts its activities and maintains its principal place of business in Biddeford, County of York, State of Maine.

## FACTUAL BACKGROUND

18. Mr. Hooper was admitted to the St. Andre Health Care Facility on or about May 27, 2008, following a series of strokes.

19. The strokes Mr. Hooper suffered left him without the use of the left side of his body and with weakness in the right side.  As a result, Mr. Hooper needs assistance to engage in many activities of daily living.

20. In October 2008, Mr. Hooper was evaluated for mobility equipment.  A motorized wheelchair that could be controlled with a joystick was recommended because he was unable to

4

ambulate or propel a manual wheelchair secondary to paraplegia of left side of the body and weakness of the right side of the body.

21. On or about November 26, 2008, MaineCare deemed the motorized wheelchair to be medically necessary and issued a prior authorization for Black Bear Medical Inc. to deliver this mobility equipment, at a cost of $12,870.14.

22. Since acquiring this equipment, Mr. Hooper has relied on it for independent mobility.  He can use this medically necessary mobility equipment independently and effectively in ways that significantly increase his functional independence.

23. On or about November 1, 2012, Defendant disabled Mr. Hooper's mobility equipment without his consent and over his strong objections.

24. According to a "Social Service Note" dated November 1, 2012, which is signed by Andrea Otis-Higgins, the CEO/Administrator at Defendant's facility, staff met with Mr. Hooper to inform him of the decision to turn off his chair and "[s]hared that we had discussed these concerns with Dr. Burnham who also expressed concern for his insight and we all felt a cooling down period where the power chair was off would provide an opportunity to reflect on a behaviorally based plan going forward, Bob expressed his frustrations and denied physical aggression against staff."

25. Defendant based its decision to restrain Mr. Hooper's mobility on stated concerns about Mr. Hooper's behavior.  However, Mr. Hooper has never injured any staff member or any resident through the use of his mobility equipment.

26. On information and belief, Defendant has a policy or practice of documenting injuries in incident reports.  And Defendant has not documented in its incident reports any injury to any staff or any resident as a result of Mr. Hooper's use of his mobility equipment.

27. Nursing facilities are required to complete, and certify as accurate, a quarterly assessment and screening for each resident.  Defendant completed this Minimum Data Set (MDS) screening for Mr. Hooper on or about April 3, 2012.  The MDS requires reporting related to behaviors. And the April 2012 MDS rated all physical or verbal behaviors by Mr. Hooper directed toward others as "0", meaning "behavior not exhibited".

28. Another MDS was completed by Defendant on or about June 6, 2012.  Again, Defendant rated all physical or verbal behaviors by Mr. Hooper directed toward others as "0", meaning "behavior not exhibited".

29. Another MDS was completed by Defendant on or about September 19, 2012.  Again, Defendant rated all physical or verbal behaviors by Mr. Hooper directed toward others as "0", meaning "behavior not exhibited".

30. In the three MDS reports completed prior to Defendant's decision to disable Mr. Hooper's medically necessary mobility equipment, Defendant did not report any physical or verbal behaviors directed toward others.

31. Another MDS was completed by Defendant on or about December 12, 2012, shortly after the decision to disable Mr. Hooper's mobility equipment.  Again, Defendant rated all physical or verbal behaviors by Mr. Hooper directed toward others as "0", meaning "behavior not exhibited".

32. Despite multiple MDS reports that indicated Mr. Hooper engaged in no physical or verbal behaviors directed towards others, and despite no record of Mr. Hooper actually injuring a staff member or another resident, Defendant took the unprecedented step of disabling Mr. Hooper's medically necessary mobility equipment.  Disabling this equipment functioned as an almost complete restraint on Mr. Hooper's independent mobility.

6

33. On or about November 6, 2012, according to a "Social Service Note", again signed by the CEO/Administrator, Andrea Otis-Higgins, Mr. Hooper expressed his frustrations that he had not been returned to self-propelling via his electronic wheelchair, and he specifically stated "what you are doing here is illegal.  You should check with your lawyer."  But Defendant refused to restore Mr. Hooper's only means of independent mobility.

34. Defendant's policies define restraint as any method "that restricts freedom of movement or normal access to one's body".  Disabling Mr. Hooper's mobility equipment restricted his freedom of movement and was a restraint under Defendant's policies.

35. Defendant's policies make clear that "restraints shall only be used where alternative methods are not sufficient to protect residents or others from injury".  Defendant did not comply with its policy in disabling Mr. Hooper's medically necessary mobility equipment for extended periods of time in the absence of a risk of injury and without first utilizing alternative methods to protect residents and others from injury.

36. Defendant's policies require that an order for restraint is written by a physician, that physician orders for the use of restraint must not be issued as standing orders, and that orders for restraints must be reviewed every 30 days.  In disabling Mr. Hooper's mobility equipment, Defendant has violated and continues to violate these provisions of its policies regarding the use of restraints.

37. On or about November 13, 2012, according to a "Social Service Note", again signed by CEO/Administrator Andrea Otis-Higgins, Mr. Hooper was informed by Defendant that his "power chair would be left disabled for self propelling."  Mr. Hooper turned on a microphone and demanded an explanation for why he would be confined to his chair, without the ability to move.  He was told he had already been given reasons.  No additional explanation was given.

38. Following Defendant's decision to disable his medically necessary mobility equipment, Mr. Hooper lost interest in activities he once enjoyed, and was increasingly isolated and depressed. These changes are confirmed by Defendant's records. An "Activity Assessment" note dated December 13, 2012, and maintained by Defendant indicates "Lacks motivation, Bob continues to prefer independent leisure. Since his electric wheelchair has been disabled he has lost motivation to do most of the leisure in which he used to enjoy such as going on outings and going outside."

39. After his mobility equipment was disabled, Mr. Hooper was not permitted to go on outings outside the facility because his chair was too heavy for staff to push in the manual mode.

40. Mr. Hooper refused food occasionally as a result of Defendant's decision to disable his mobility equipment, and he engaged in increased instances of self-injurious behaviors, protesting his confinement in the only ways available to him.

41. At some point in or around April 2013, Mr. Hooper was allowed the use of his chair during self care activities in his room. Around this time, a laminated sign was affixed to Mr. Hooper's door which read: "Bob can have electric part of wheelchair ONLY during A.M. CARE".

42. Except for this period of time in the morning, or when a staff member defied Defendant's instructions and turned on his medically necessary mobility equipment, Mr. Hooper was confined to his chair and left entirely immobile except for the ability to tilt forward and backward.

43. During this period, Mr. Hooper was unable to get his own coffee, get a drink from the water cooler, go independently to activities, head outdoors, or interact with other residents – all activities he could engage in independently prior to Defendant's actions.

44. Prior to Defendant's decision to disable Mr. Hooper's medically necessary mobility equipment, Mr. Hooper spent much of his free time outside, often travelling independently to a community park where he interacted with people outside the facility. But following the restraints on his mobility, most of Mr. Hooper's free time was spent isolated in his room, or at the computer immediately outside his door.

45. During this period, Mr. Hooper would be left in his room facing the window. And if he wanted to turn away from the window, or move to the computer, both activities he was previously capable of doing independently, he would have to ring his bell and wait, sometimes fifteen minutes or more.

46. During these periods of restraint and deprivation, Mr. Hooper felt like a prisoner. He felt helpless. And he felt anger towards those who had taken away much of the independence that remained after his series of strokes.

47. On or about May 14, 2013, Mr. Hooper had a visitor and asked to have his wheelchair turned on so he could go outside with his friend. Defendant refused. And Mr. Hooper again objected to this confinement, stating "I am in prison here". When Mr. Hooper's visitor enabled the chair so they could walk together outside, which they did without incident, staff determined that Mr. Hooper could no longer go outside until further notice.

48. Over a period of several months, Mr. Hooper worked with Caryl Richardson of the Long Term Care Ombudsman Program (LTCOP) in an effort to restore his independent mobility.

49. Ms. Richardson, a licensed social worker, was troubled by Defendant's actions and viewed disabling Mr. Hooper's mobility equipment as a clear use of restraint. After multiple unsuccessful attempts to encourage Defendant to restore Mr. Hooper's mobility, Ms. Richardson referred him to the Disability Rights Center.

50. On June 12, 2013, the Disability Rights Center provided written notice of intent to file suit on Mr. Hooper's behalf, as required by 22 M.R.S.A. § 7948.  This letter requested the restoration of Mr. Hooper's right to independent mobility without condition and without delay. Again, Defendant declined to restore Mr. Hooper's access to his mobility equipment.

51. On or about June 20, 2013, Mr. Hooper and his counsel met with Andrea Otis-Higgins, the CEO/Administrator for Defendant, as well as Defendant's counsel.  Mr. Hooper again demanded restoration of his right to independent mobility.

52. Defendant agreed to restore the functioning to Mr. Hooper's mobility equipment, but continued to insist that his use of this equipment be severely limited, restricting its use to his room and the area immediately outside his room.  Should Mr. Hooper wish to go outside this area, Defendant required (and continues to require) that he call and wait for an escort outside the building.  Once outside, Mr. Hooper would then be free to utilize his medically necessary mobility equipment.

53. Defendant decided to bring in a consultant, Stephanie Truman, RN, to assess the situation and to make recommendations.  But Defendant was unwilling to allow Mr. Hooper to use his medically necessary mobility equipment except in the limited ways described above.

54. Mr. Hooper continued to object to these restrictions, but he complied with them in the hopes that his right to independent mobility would soon be fully restored.

55. On one occasion, Mr. Hooper (who is diabetic) did not comply with these restrictions because his blood sugar was low and he had waited for several minutes after ringing his call button.  He drove his chair to the nursing station and told them his sugar was low.  His chair was immediately shut off in front of other staff and residents and he was manually pushed back to his room, where he eventually received treatment.

10

56. On August 1, 2013, Mr. Hooper was supposed to meet his attorney in the lobby and an escort was not available, so he began to travel toward the elevator on his own.  One of Defendant's employees came running out of another resident's room and immediately shut off his chair.  He sat there, unable to move, until a nurse escorted him to the elevator.

57. On information and belief, Defendant has instructed staff to disable Mr. Hooper's chair anytime he moves independently away from his room, even in the absence of any risk of injury or harm.  On information and belief, some of Defendant's employees have been told that they will lose their jobs if they do not immediately disable Mr. Hooper's chair if he leaves the area immediately outside of his room.  Defendant's position is not pursuant to or consistent with a physician's order.  This position is not consistent with Defendant's policies regarding the use of restraint.  And this position is contrary to state law and regulation regarding the use of restraint in facilities such as the one operated by Defendant.

58. As a result of these continued restrictions, Mr. Hooper still cannot get his own coffee or a drink from the water cooler.  He cannot venture into common areas or interact with other residents unless they come to the area outside his room.  He cannot move independently to activities or go outside, and instead has to wait, sometimes fifteen minutes or longer, for an escort to leave the immediate area outside of his room.

59. Mr. Hooper continues to feel helpless, and isolated, and wronged by Defendant's actions. He does not understand the legal basis for these actions because Defendant has never provided one and because there is no legal basis for Defendant's use of restraints.  He continues to feel like a prisoner in Defendant's facility instead of a resident.

60. But for Mr. Hooper's disabilities, he would be able to walk.  On information and belief, Defendant does not similarly immobilize residents who can walk or restrict their mobility for

long periods of time.  On information and belief, Defendant does not similarly restrict the right to independent mobility of residents who can walk to brief time periods or closely defined spaces.

61. But for Mr. Hooper's disabilities, he would be able to propel a manual wheelchair.  On information and belief Defendant does not take away manual wheelchairs from residents or strap them to chairs to similarly restrict their mobility for long periods of time.   On information and belief, Defendant does not similarly restrict the right to independent mobility for residents who use manual wheelchairs to brief time periods or closely defined spaces.

62. On or about June 25, 2013, Mr. Hooper participated in a wheelchair mobility assessment with Christopher Delenick, OTR/L.  The assessment concluded: "At no time during the assessment did I believe the consumer to be a safety risk to himself or others…In short, Mr. Hooper thoroughly demonstrated the independent and safe use of his personal power wheelchair in all settings."  These results were provided to Defendant.  But the restrictions on Mr. Hooper's independent mobility were not relaxed.

63. On information and belief, on or about July 11, 2013, Defendant was informed by its consultant, Stephanie Truman, RN, that restricting Mr. Hooper's mobility was indeed a restraint and that such restrictions could not be imposed without meeting many conditions precedent, which had not been met.  But the restrictions on Mr. Hooper's use of his medically necessary mobility equipment were not relaxed.

64. Mr. Hooper was evaluated by an independent psychologist, Dr. Ron Breazeale.  Dr. Breazeale reviewed records, interviewed staff, and conducted assessment activities with Mr. Hooper.  Dr. Breazeale completed his evaluation on July 26, 2013, and concluded that Mr. Hooper was not presenting a risk to himself or others.  Dr. Breazeale also expressed his opinion that restricting access to Mr. Hooper's medically necessary mobility equipment was

unwarranted.  These conclusions were shared with Defendant, through counsel, and Defendant was invited to contact Dr. Breazeale.  But the restrictions on Mr. Hooper's use of his medically necessary mobility equipment were not relaxed.

## COUNT 1 - VIOLATIONS OF TITLE III OF THE
## AMERICANS WITH DISABILITIES ACT

65. Plaintiff incorporates the allegations set forth in paragraphs 1 through 64 by reference.

66. At all material times, Mr. Hooper has been an individual with a disability within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12102.  As a result of his strokes, Mr. Hooper has physical impairments that substantially limit one or more major life activities, including but not limited to: caring for himself, performing manual tasks, walking, standing, lifting, bending, and working.

67. Defendant's health care facility is a place of public accommodation as that term is defined in the ADA, 42 U.S.C. § 12181(7)(F).

68. The ADA provides that no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation. 42 U.S.C. § 12182(a).

69. Mr. Hooper was subjected to discrimination on the basis of his disability each and every time Defendant disabled his medically necessary mobility equipment, which denied him the opportunity to participate in and benefit from the goods, services, facilities, privileges, advantages or accommodations provided to other residents at Defendant's facility, in violation of 42 U.S.C. § 12182(b)(1)(A)(i).

13

70. Mr. Hooper was subjected to discrimination on the basis of his disability each and every time Defendant disabled his medically necessary mobility equipment, which afforded him unequal benefits and participation in the goods, services, facilities, privileges, advantages or accommodations provided to other residents at Defendant's place of public accommodation, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii).

71.  And Mr. Hooper continues to be subjected to discrimination as his right to independent mobility is severely restricted and as he lives under the threat that his medically necessary mobility equipment will again be disabled if he ventures outside the boundaries imposed by the Defendant.  As a result, he continues to be denied opportunities to participate in the programs and receive the benefits provided to other residents at Defendant's place of public accommodation.

72. Defendant's decision to immobilize Mr. Hooper's medically necessary mobility equipment constitutes intentional discrimination on the basis of his disability, and this discrimination has occurred, on an almost daily basis, since November 1, 2012.

73. Defendant's conduct constitutes an ongoing and continuous violation of the ADA and its implementing regulations.  Unless restrained from doing so, Defendant will continue to violate the ADA.  Unless enjoined, Mr. Hooper will continue to suffer injury as a result of Defendant's discriminatory actions.

74. Mr. Hooper is not now, nor has he been during any time relevant to this Complaint, a direct threat to the health and safety of others as that term is defined in the ADA, 42. U.S.C. § 12182(b)(3).

75. The ADA authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities. 42 U.S.C. § 12188(a)(1).  Mr. Hooper is entitled to injunctive

relief as well as reasonable attorney's fees and costs.  Equitable relief is necessary because relief at law is inadequate to prevent additional injury.


### COUNT 2 – VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT

76. Plaintiff incorporates the allegations set forth in paragraphs 1 through 75 by reference.

77. Section 504 of the Rehabilitation Act ("Section 504") provides that "no otherwise qualified individual with a disability…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance", 29 U.S.C. § 794(a).

78. Mr. Hooper is an individual with a disability which substantially limits one or more major life activities and protected by Section 504, 29 U.S.C. § 705(9)(B); and 42 U.S.C. §12102.

79. Defendant reports total program service revenue in excess of seven million dollars per year.  On information and belief, Defendant receives a substantial amount of this program service revenue through Medicare or Medicaid payments paid on behalf of individuals receiving care.  On information and belief, Medicaid payments to Defendant for Maine state fiscal year 2013 totaled $3,905,716.76.  These payments are sufficient to constitute federal financial assistance for purposes of Section 504 of the Rehabilitation Act.

80. Mr. Hooper's stay has been primarily funded through the use of Medicaid and/or Medicare benefits.

81. Defendant has excluded Mr. Hooper from participation in, denied him the benefits of, and subjected him to discrimination under its programs and activities, solely on the basis of his disability.

82. Defendant's decision to disable Mr. Hooper's medically necessary mobility equipment, which eliminated his ability to move independently, was the product of bad faith and/or gross misjudgment.  Defendant's actions violated its own policies with regard to the use of restraint. Defendant's discriminatory actions continued even after Mr. Hooper protested that they were illegal and demanded Defendant consult with its counsel.  Defendant's discriminatory actions continued after being informed by an employee at the Long Term Care Ombudsman Program that the actions constituted restraint and were impermissible.  Defendant's discriminatory actions continued after a mobility expert concluded that Mr. Hooper could safely operate his mobility equipment.  Defendant's discriminatory actions continued after a consulting nurse informed Defendant that these actions constitute restraints.  And Defendant's discriminatory actions continue to this day after a psychologist concluded that Mr. Hooper is not a danger to himself or others and that continued restrictions on his mobility are unwarranted.

83. The decision to substantially restrict or eliminate Mr. Hooper's independent mobility was based solely on Mr. Hooper's disability.  Mr. Hooper's ability to move independently was almost completely eliminated from on or about November 1, 2012 through on or about June 20, 2013, a period of approximately 232 days. Since June 20, 2013, Defendant continues to severely limit Mr. Hooper's use of his wheelchair, directly limiting his mobility and access to programs and activities.  These severe restrictions on mobility would never have been imposed on Mr. Hooper if he could walk, or operate a manual wheelchair.

84. On information and belief, if Mr. Hooper could walk, Defendant would not have bound his legs or otherwise restrained his ability to walk for all or part of 232 days as a result of his alleged behaviors.  On information and belief, if Mr. Hooper could operate a manual wheelchair, Defendant would not have strapped him to a chair or otherwise restrained his mobility for all or

16

part of 232 days as a result of his alleged behaviors.  On information and belief, such actions would be inconsistent with Defendant's policies and practices as applied to individuals who are able to walk or operate a manual wheelchair.

85. Mr. Hooper has been harmed and continues to be harmed by this discrimination.  He has lost interest in activities he once enjoyed, demonstrated an increase in self-injurious behaviors and agitation, and been subjected to significant emotional distress as a direct result of Defendant's decision to immobilize his wheelchair.

86. Defendant will continue to violate Mr. Hooper's rights unless enjoined from doing so. Equitable relief is necessary because relief at law is inadequate to prevent additional injury.

87. Section 504 authorizes declaratory and injunctive relief as well as compensatory damages to remedy discrimination against individuals with disabilities by programs receiving federal financial assistance, 29 U.S.C. § 794a(a)(1).  Mr. Hooper is entitled to injunctive relief and compensatory damages, as well as reasonable attorneys' fees as part of prevailing party costs.

## COUNT 3 – ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO 22 M.R.S.A. § 7948.

88. Plaintiff incorporates the allegations set forth in paragraphs 1 through 87 by reference.

89. Defendant operates an "assisted living program" providing "assisted living services" as those terms are defined at *Me. Dep't of Hum. Serv.* 10-144 CMR 113-2.8 and 2.9, and operates pursuant to the Regulations Governing the Licensing and Functioning of Assisted Housing Programs at *Me. Dep't of Hum. Serv.* 10-144 CMR 113, and Maine statute at 22 M.R.S.A. §7941 *et seq.*

90. Plaintiff has resided at Defendant's facility since his admission on or about May 27, 2008, pursuant to a contract as defined in *Me. Dep't of Hum. Serv.* 10-144 CMR 113-3.25.

91. Plaintiff has been a MaineCare recipient since his admission to Defendant's facility.

92. On June 12, 2013, Plaintiff provided the required notice of intent to commence civil litigation to Defendant, through its CEO/Administrator, Andrea Otis-Higgins.  In addition, as required by 22 M.R.S.A. § 7948, notice was also provided to Attorney General Janet T. Mills and DHHS Commissioner Mary Mayhew.

93. Defendant's actions, which eliminated or otherwise limited Mr. Hooper's only means of independent mobility, constitute abuse under *Me. Dep't of Human Serv.* 10-144 CMR 110-1("Abuse means the infliction of injury, *unreasonable confinement*, *intimidation or cruel punishment with resulting* physical harm or pain or *mental anguish*, sexual abuse or exploitation *or the willful deprivation of essential needs*.")(emphasis added).

94. Defendant, in eliminating or restricting Mr. Hooper's only means of independent mobility, has violated and continues to violate his "right to be free from any physical restraints imposed…for purposes of punishment for certain behaviors or to accommodate the needs of the staff, and is not required to treat the resident's specific condition", in violation of *Me. Dep't of Human Serv.* 10-144 CMR 110-10.10.R.

95. Defendant, in eliminating or restricting Mr. Hooper's only means of independent mobility, has violated and continues to violate his "right to [c]hoose activities, schedules and health care consistent with his/her interests, assessments, and plans of care", in violation of *Me. Dep't of Human Serv.* 10-144 CMR 110-10.10.T.1;

96. Defendant, in eliminating or restricting Mr. Hooper's only means of independent mobility, has violated and continues to violate his "right to [i]nteract with members of the

community both inside and outside the facility", in violation of *Me. Dep't of Human Serv.* 10-144 CMR 110-10.10.T.2.

97. Since on or about November 1, 2012, Defendant has used, and continues to threaten to use, a series of prolonged and repeated physical restraints (disabling Mr. Hooper's medically necessary mobility equipment) without a physician's order that complies with state law and regulation, in violation of *Dep't of Human Serv.* 10-144 CMR 110-10.11.A.1.

98. Since on or about November 1, 2012, Defendant has used and continues to threaten to use physical restraint (disabling Mr. Hooper's medically necessary mobility equipment) without documented evidence of less restrictive measures to promote greater functional independence, without a documented medical reason in the care plan, and without a care plan that documents a succession of approaches to be utilized before restraints are used, in violation of  *Dep't of Human Serv.* 10-144 CMR 110-10.11.A.2.

99. Since on or about November 1, 2012, Defendant has used and continues to threaten to use physical restraint (disabling Mr. Hooper's medically necessary mobility equipment) for an undetermined and unspecified length of time, in violation of *Dep't of Human Serv.* 10-144 CMR 110-10.11.A.3.

100.      Defendant has repeatedly used physical restraints (disabling Mr. Hooper's medically necessary mobility equipment) without the agreement of the resident, in violation of *Dep't of Human Serv.* 10-144 CMR 110-10.11.A.5; and

101.      Since November 1, 2012, Defendant has used and continues to threaten to use physical restraints (disabling Mr. Hooper's medically necessary mobility equipment) without releasing the restraints for at least 15 minutes every 2 hours or keeping a written record of the restraint and release, in violation of  *Dep't of Human Serv.* 10-144 CMR 110-10.11.A.9.

102.     Defendant's actions constitute a failure to comply with state licensing laws pursuant to 22 M.R.S.A. § 7948(1) and 22 M.R.S.A. §7853 and a violation of the Regulations Governing the Licensing and Functioning of Assisted Housing Programs at *Me. Dep't of Hum. Serv.* 10-144 CMR 113.

103.     Mr. Hooper has suffered and will continue to suffer irreparable injury if Defendant is not enjoined from continuing to restrict his right to independent mobility in ways that violate state licensing laws and related regulations. The injury to Mr. Hooper through the continued imposition of illegal restraints on his mobility far outweighs any harm that could come to Defendant.  Defendant's violations of state law and regulation are clear, so Mr. Hooper is likely to succeed on the merits.  And granting injunctive relief would serve the public interest by reinforcing the right of vulnerable populations in licensed settings to be free from unnecessary restraints.

104.      Injunctive and declaratory relief are available to address these violations pursuant to 22 M.R.S.A. § 7948(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

    a) Grant preliminary and permanent injunctive relief, preventing Defendant from continuing to restrict Mr. Hooper's access to and use of his medically necessary mobility equipment;

    b) Grant judgment to Plaintiff against Defendant;

    c) Declare that Defendant has violated Mr. Hooper's rights as identified in the Complaint;

    d) Award compensatory damages sufficient to remedy violations of Section 504 of the Rehabilitation Act;

    e) Award Plaintiff reasonable attorneys' fees and costs; and

    f) Grant such other and further relief as the Court deems just and proper.


Respectfully Submitted,


Dated: August 2, 2013


       s/ Atlee Reilly
Atlee Reilly, Maine Bar #005159
areilly@drcme.org

      s/ Peter Rice
Peter Rice, Maine Bar #7727
price@drcme.org

DISABILITY RIGHTS CENTER
24 Stone Street, Suite 204
Augusta, Maine 04330
p) 207.626.2774 x220
f) 207.621.1419


Attorneys for Plaintiff Robert M. Hooper